Approved: _____
SAMUEL P. ROTHSCHILD
Assistant United States Attorney

Before:   THE HONORABLE GABRIEL W. GORENSTEIN
          United States Magistrate Judge
          Southern District of New York

20 MAG 4932

- - - - - - - - - - - - - - - - x
                                 :
UNITED STATES OF AMERICA         :   SEALED COMPLAINT
                                 :   Violations of
   - v. -                        :   18 U.S.C. §§ 924, 1951, and 2
                                 :
TYREEK JAMES, and                :
OMARI WILLIAMS,                  :
                                 :   COUNTY OF OFFENSE:
          Defendants.            :   New York
                                 :
- - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

ANGELO TESSITORE, being duly sworn, deposes and says that he is a Detective with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") / New York City Police Department ("NYPD") Joint Robbery Task Force, and charges as follows:

COUNT ONE
(Hobbs Act Robbery Conspiracy)

1.   From on or about August 3, 2019 up to and including on or about August 17, 2019, in the Southern District of New York and elsewhere, TYREEK JAMES and OMARI WILLIAMS, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree, together and with each other, to commit robbery, as that term is defined in Title 18, United States Code, Section 1951(b)(1), and would and did thereby obstruct, delay, and affect commerce and the movement of articles and commodities in commerce, as that term is defined in Title 18, United States Code, Section 1951(b)(3).

(Title 18, United States Code, Section 1951(a).)

## COUNT TWO
(Hobbs Act Robbery)

2. On or about August 3, 2019, in the Southern District of New York and elsewhere, TYREEK JAMES and OMARI WILLIAMS, the defendants, did knowingly commit robbery, as that term is defined in Title 18, United States Code, Section 1951(b)(1), and did thereby obstruct, delay, and affect commerce and the movement of articles and commodities in commerce, as that term is defined in Title 18, United States Code, Section 1951(b)(3), to wit, JAMES and WILLIAMS wielded a gun and robbed a parking garage on East 13th Street in New York, New York, taking cash, an employee's cellphone, and a car that was parked in the garage.

(Title 18, United States Code, Sections 1951(a) and 2.)

## COUNT THREE
(Hobbs Act Robbery)

3. On or about August 16, 2019, in the Southern District of New York and elsewhere, TYREEK JAMES and OMARI WILLIAMS, the defendants, did knowingly commit robbery, as that term is defined in Title 18, United States Code, Section 1951(b)(1), and did thereby obstruct, delay, and affect commerce and the movement of articles and commodities in commerce, as that term is defined in Title 18, United States Code, Section 1951(b)(3), to wit, JAMES and WILLIAMS wielded a knife and robbed a parking garage on West 59th Street in New York, New York, taking cash, an employee's cellphone, and a car that was parked in the garage.

(Title 18, United States Code, Sections 1951(a) and 2.)

## COUNT FOUR
(Hobbs Act Robbery)

4. On or about August 17, 2019, in the Southern District of New York and elsewhere, TYREEK JAMES and OMARI WILLIAMS, the defendants, did knowingly commit robbery, as that term is defined in Title 18, United States Code, Section 1951(b)(1), and did thereby obstruct, delay, and affect commerce and the movement of articles and commodities in commerce, as that term is defined in Title 18, United States Code, Section 1951(b)(3), to wit, JAMES and WILLIAMS wielded a knife and robbed a parking garage on East 63rd Street in New York, New York, taking cash and an employee's wallet and cellphone.

(Title 18, United States Code, Sections 1951(a) and 2.)

COUNT FIVE
(Brandishing a Firearm in Furtherance of a Crime of Violence)

5. On or about August 3, 2019, in the Southern District of New York and elsewhere, TYREEK JAMES and OMARI WILLIAMS, the defendants, during and in relation to a crime of violence for which they may be prosecuted in a court of the United States, namely, the Hobbs Act robbery charged in Count Two of this Complaint, knowingly did use and carry a firearm, and, in furtherance of such crime, did possess a firearm, and did aid and abet the use, carrying, and possession of a firearm, which was brandished as part of the offense charged in Count Two of this Complaint.

(Title 18, United States Code, Sections 924(c)(1)(A)(i), (ii) and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

6. I am a Detective with the ATF/NYPD Joint Robbery Task Force, and I have been personally involved in this investigation. This affidavit is based on my investigation, my conversations with other law enforcement agents and other individuals, and my examination of reports and records. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

7. Based on talking to law enforcement officers and reviewing materials they provided, I learned the following:

a. On or about Saturday, August 3, 2019 at approximately 11:38 p.m., two black men asked to be buzzed into a parking garage on East 13th Street in New York, New York ("Parking Garage-1"). An employee of Parking Garage-1 ("Employee-1") buzzed them in and exited his booth to assist them. One of the men displayed a silver handgun and ordered Employee-1 back to his booth.

b. The men took cash from Employee-1's register and Employee-1's cellphone, and fled in a gray, two-door, 2018 Porsche 911 with a particular New York license plate number (the "Stolen Porsche"), which was parked in Parking Garage-1 with the keys inside.

8.  Based on reviewing license plate reader information in a law enforcement database, I learned the following:

    a.  On or about August 3, 2019 at approximately 11:58 p.m. (*i.e.*, approximately 20 minutes after the Parking Garage-1 robbery), the Stolen Porsche was traveling north on the FDR Drive in New York, New York.[1]

    b.  On or about Sunday, August 4, 2019 at approximately 12:29 a.m. (*i.e.*, approximately 50 minutes after the Parking Garage-1 robbery), the Stolen Porsche was traveling across the George Washington Bridge from New York to New Jersey.

9.  Based on viewing footage from a pole camera, I learned that on or about August 4, 2019 (*i.e.*, the day after the Stolen Porsche was stolen), in Schenectady, New York, a car matching the description of the Stolen Porsche pulled up and parked and two black men exited the car—one out of the driver's seat and the other out of the passenger seat. A few minutes later, those same men reentered that car and drove away.

10. Based on my training and experience, I know that a common route for driving from East 13th Street in New York, New York to Schenectady, New York would involve driving north on the FDR Drive in New York, New York and traveling across the George Washington Bridge from New York to New Jersey.

11. Based on talking to law enforcement officers and reviewing materials they provided, I learned the following:

    a.  On or about Monday, August 5, 2019, a man entered a grocery store in Schenectady, New York (the "Grocery Store"), wielding a silver handgun. He ordered everyone to get on the ground, and instructed one of the employees to get up and give him money and cigarettes. After the robber left with the cash and

---

[1] Based on reviewing license plate reader information in a law enforcement database, I know that, on or about August 3, 2019 at approximately 11:53 p.m. (*i.e.*, approximately 15 minutes after the Parking Garage-1 robbery), the Stolen Porsche was traveling Brooklyn-bound over the Brooklyn Bridge, and, at approximately 11:55 p.m., the Stolen Porsche was traveling Manhattan-bound over the Brooklyn Bridge. This indicates that, after stealing the Stolen Porsche in Manhattan, the robbers took the car into Brooklyn and, two minutes later, took it back into Manhattan to proceed north on the FDR Drive.

4

cigarettes, the employee looked out the window of the Grocery Store and saw a dark, two-door sports car driving away.

   b. On or about August 5, 2019, after the Grocery Store was robbed, law enforcement officers located the Stolen Porsche in the vicinity of the Southgate Apartments in Schenectady, New York. Law enforcement officers looked up the license plate number of the Stolen Porsche, discovered that it was stolen, and took possession of it.

   c. On or about Thursday, August 8, 2019 at approximately 12:55 p.m., two black men entered a barbershop in Albany, New York (the "Barbershop"), and one of them was wielding a silver handgun. The two men demanded money and property from the employees and customers in the Barbershop, and they took, among other things, the keys to a Mercedes Benz that belonged to one of the customers in the Barbershop (the "Stolen Mercedes").

   d. Based on license plate reader information in a law enforcement database, law enforcement officers learned that the Stolen Mercedes was in Schenectady, New York by at least approximately 1:22 p.m. on August 8, 2019 (*i.e.*, roughly half an hour after the Barbershop was robbed).

   e. Based on my training and experience, I know that one can drive from Albany, New York to Schenectady, New York in roughly half an hour.

   f. Based on GPS tracking information provided by Mercedes, law enforcement officers learned that the Stolen Mercedes was near 43 Division Street, Schenectady, New York ("43 Division Street").

   g. At approximately 2:02 p.m. on August 8, 2019, law enforcement officers went to 43 Division Street and observed the Stolen Mercedes parked in the rear of the property.

   h. Law enforcement officers called the occupants out of 43 Division Street. Two of the men who exited 43 Division Street matched the description of the suspects of the Barbershop robbery. Those two individuals were taken into custody and fingerprinted. One was TYREEK JAMES, the defendant, and the other was OMARI WILLIAMS, the defendant.

   i. One of the occupants who exited 43 Division Street ("Resident-1") said that s/he resides there and provided law enforcement officers written consent to search the premises under Resident-1's control—namely, the first floor and basement of

5

43 Division Street. Additionally, officers obtained a warrant to search 43 Division Street. Officers recovered the keys to the Stolen Mercedes in 43 Division Street.

        j. Another of the individuals who exited 43 Division Street and who resides there ("Resident-2") also spoke to law enforcement officers. Officers showed Resident-2 images from the August 4, 2019 pole camera footage described above in paragraph 9. Resident-2 stated, in sum and substance, that, among other things, s/he recognized: (1) the car as a car that previously had been parked in front of Resident-2's residence; (2) one of the two men as his cousin, "Tyreek"; and (3) the other man as Tyreek's friend "Kay." Officers showed Resident-2 a picture of OMARI WILLIAMS, the defendant, from a law enforcement database. Resident-2 identified that picture as Tyreek's friend Kay. Resident-2 further stated, in sum and substance, that Tyreek had introduced Kay to Resident-2 when Tyreek and Kay had come up from New York City earlier in the week.

        k. On or about August 14, 2019, JAMES and WILLIAMS were released from custody on their own recognizance.

    12. Based on talking to law enforcement officers and reviewing materials they provided, I learned the following:

        a. On or about Friday, August 16, 2019 (*i.e.*, approximately two days after TYREEK JAMES and OMARI WILLIAMS, the defendants, were released from custody on their own recognizance) at approximately 12:15 a.m., two black men entered a parking garage on West 59th Street in New York, New York ("Parking Garage-2") and asked an employee of Parking Garage-2 ("Employee-2") whether they could use the restroom.

        b. Before Employee-2 could answer, one of the men displayed a knife and demanded money. The men took cash, Employee-2's cellphone, and keys to a black 2011 Audi A8 with a particular New Jersey license plate number (the "Stolen Audi"), and fled in the Stolen Audi.

    13. Based on reviewing footage from a surveillance camera across the street from Parking Garage-2, I learned that approximately seven minutes before the Parking Garage-2 robbery, two men were walking in the vicinity. Both men are black and one is taller than the other. The taller man was wearing, among other things, a white short-sleeve shirt, athletic pants that are mostly black except for a white stripe on the side of the thighs, and white sneakers. The shorter man was wearing, among other things, sneakers that were mostly dark with white soles.

14. Based on reviewing records from law enforcement databases, I learned that TYREEK JAMES, the defendant, is taller than OMARI WILLIAMS, the defendant.

15. Based on talking to law enforcement officers and reviewing materials they provided, I learned the following:

    a. On or about Saturday, August 17, 2019 at approximately 11:00 p.m., two black men entered a parking garage on East 63rd Street in New York, New York ("Parking Garage-3"). One of the men displayed a knife to an employee of Parking Garage-3 ("Employee-3"), and the men demanded money.

    b. The men took Employee-3's wallet and cellphone, and cash that belonged to Parking Garage-3.

16. Based on reviewing footage from a surveillance camera next door to Parking Garage-3, I learned the following:

    a. Approximately five minutes before the Parking Garage-3 robbery, and immediately after the Parking Garage-3 robbery, two men were walking in the vicinity.

    b. In the footage from before the robbery, one of the men was wearing, among other things, a white short-sleeve shirt, athletic pants that are mostly black except for a white stripe on the side of the thighs, and white sneakers (*i.e.*, what appears to be the same outfit that the taller man was wearing in the surveillance footage from the vicinity of the Parking Garage-2 robbery). He was also holding what appears to be a gray shirt. In the footage from after the robbery, that man was wearing, among other things, a gray short-sleeve shirt, athletic pants that are mostly black except for a white stripe on side of the thighs, and white sneakers.

    c. In the footage from both before and after the Parking Garage-3 robbery, the other man was wearing, among other things, a red shirt with white markings on the back and the left shoulder and sneakers that were mostly dark with white soles (*i.e.*, what appear to be the same sneakers that the shorter man was wearing in the surveillance footage from the vicinity of the Parking Garage-2 robbery).

17. Based on reviewing surveillance footage and audio from a cellphone store in Schenectady, New York (the "Cellphone Store"), I learned the following:

7

    a. On or about August 18, 2019 (*i.e.*, the day after Parking Garage-3 was robbed, and two days after the Stolen Audi was stolen), a dark Audi parked near the Cellphone Store, two men exited the Audi and walked toward the store. Both men are black and one is taller than the other.

    b. The taller man was wearing, among other things, a gray short-sleeve shirt, athletic pants that are mostly black except for a white stripe on the side of the thighs, and white sneakers (*i.e.*, what appear to be the same pants and sneakers that the taller man was wearing in the surveillance footage from the vicinity of the Parking Garage-2 robbery, and what appear to be the same shirt, pants, and sneakers that one of the men was wearing in the surveillance footage from the vicinity of the Parking Garage-3 robbery).

    c. The shorter man was wearing, among other things, a red shirt with white markings on the back and the left shoulder and sneakers that were mostly dark with white soles (*i.e.*, what appear to be the same sneakers that the shorter man was wearing in the surveillance footage from the vicinity of the Parking Garage-2 robbery, and what appear to be the same shirt and sneakers that one of the men was wearing in the surveillance footage from the vicinity of the Parking Garage-3 robbery).

    d. The taller man entered the Cellphone Store, and the shorter man waited outside. While the taller man was talking to the employee, the shorter man briefly entered the Cellphone Store, and then the taller man and the shorter man both exited the Cellphone Store without engaging in any transaction.

    e. The next day, on or about August 19, 2019, two black men entered the Cellphone Store. One was taller than the other. The shorter man went behind the counter and wielded a hammer and a knife. The employee behind the counter ("Employee-4") told the shorter man that he could not be behind the counter. The shorter man took a box cutter that was sitting behind the counter, and then the shorter man and the taller man exited the Cellphone Store.

    18. Based on talking to law enforcement officers and reviewing materials they provided, I learned the following:

    a. On or about August 21, 2019, law enforcement officers, who were told to be on the lookout for the Stolen Audi, located the Stolen Audi in the vicinity of the Southgate Apartments in Schenectady, New York. Law enforcement officers attempted a traffic stop with two individuals inside the Stolen Audi. After

a brief car chase, the two individuals fled on foot and were apprehended by law enforcement officers.

        b. The individuals who were apprehended were fingerprinted and identified as TYREEK JAMES and OMARI WILLIAMS, the defendants.

        c. Employee-4 identified WILLIAMS in an array of six photos. Employee-4 stated, in sum and substance, that WILLIAMS "was the shorter more aggressive male" and that WILLIAMS was in the Cellphone Store the day before the robbery as well as the day of the robbery. When shown a different array of six photos, Employee-4 stated, in sum and substance, that, while he was not certain, he believed the photo of JAMES "was the other male, the taller one."

    19. Based on talking to law enforcement officers and reviewing materials they provided, I learned that, when TYREEK JAMES, the defendant, was taken into custody on August 8, 2019, he had in his possession a particular cellphone ("Cellphone-1"), and, when JAMES was released from custody on August 14, 2019, law enforcement retained Cellphone-1.

    20. Based on reviewing surveillance footage and audio from the Cellphone Store, I learned that the taller man who entered the Cellphone Store on or about August 18, 2019, as discussed above in paragraph 17, told the employee behind the counter that he lost his phone, which was subscribed to in his mother's name, ("Name-1"). To identify the phone, the taller man provided the employee with a particular phone number ("Phone Number-1").

    21. Based on reviewing information from Cellphone-1's service provider, I learned that Phone Number-1 is the call number assigned to Cellphone-1, and that Cellphone-1 is subscribed to Name-1.

    22. Based on historical location information for the cellphone assigned Phone Number-1 received in response to a judicially authorized search warrant, I learned the following:

        a. On or about August 3, 2019 at approximately 10:45 p.m. (*i.e.*, roughly 53 minutes before the Parking Garage-1 robbery), Phone Number-1 contacted a cellphone tower in lower Manhattan, relatively near Parking Garage-1. By contrast, on each occasion that Phone Number-1 contacted a cellphone tower earlier in the day on or about August 3, 2019, the cellphone tower was in Brooklyn.

       b.   On or about August 4, 2019 at approximately 2:29 a.m., 3:10 a.m., and 3:59 a.m., Phone Number-1 contacted cellphone towers in the vicinity of Walden, New York; Hudson, New York; and Rotterdam, New York, respectively.[2]

      23.   Based on my training and experience, I know that a common route for driving from East 13th Street, New York, New York to Schenectady, New York would involve driving north on a highway that would bring the driver in the vicinity of Walden, New York; Hudson, New York; and Rotterdam, New York.

      24.   Based on reviewing material on Cellphone-1 in accordance with a judicially authorized search warrant, I learned the following:

       a.   Cellphone-1 contains a roughly 39-second video that was recorded on or about August 4, 2019 at approximately 2:05 a.m. (*i.e.*, approximately 2.5 hours after the Parking Garage-1 robbery) ("Video-1").  Video-1 appears to have been recorded by OMARI WILLIAMS, the defendant, who films himself sitting in the passenger seat of a moving vehicle, talking about the fact that he is in a "Porsche 911."  Video-1 shows TYREEK JAMES, the defendant, in the driver seat.  Video-1 depicts part of the car's dashboard and shows that the car's steering wheel has the Porsche logo.

       b.   Cellphone-1 contains a roughly 30-second video that was recorded on or about August 4, 2019 at approximately 5:44 a.m. (i.e., approximately 6 hours after the Parking Garage-1 robbery) ("Video-2").  The person recording Video-2 talks but does not film his face.  Video-2 focuses on a key chain that includes, among other things, the Porsche logo, a keyring attachment that says "Manhattan Motorcars," and a keyring attachment that says "Fenway."  Video-2 also focuses on cash in the hand of the person recording.

---

[2] Based on historical location information for the cellphone assigned Phone Number-1 received in response to a judicially authorized search warrant, I know that on or about August 4, 2019 at approximately 12:47 a.m. (*i.e.*, approximately one hour and nine minutes after the Parking Garage-1 robbery), Phone Number-1 contacted a cellphone tower in the vicinity of Union City, New Jersey, which is south of the George Washington Bridge.  This indicates that, after crossing into New Jersey over the George Washington Bridge, the robbers appear to have driven the Stolen Porsche south before eventually heading back north up to Schenectady, New York.

        c. Cellphone-1 contains a roughly 67-second video that was recorded on or about August 4, 2019 at approximately 4:43 p.m. ("Video-3"). Video-3 appears to have been recorded by JAMES, who films himself sitting inside of a parked vehicle. At one point, JAMES shows the camera a key chain that appears to be same as the key chain in Video-2. At another point, JAMES focuses the camera on WILLIAMS, who is standing outside the vehicle.

        d. On or about August 5, 2019, someone texted Cellphone-1, "Text me the name of the car again." Cellphone-1 responded, "Porsche 911 . . . ."

25. Based on reviewing and photographing the Stolen Porsche after it was recovered, I learned that the Stolen Porsche's dashboard looks like the dashboard depicted in Video-1.

26. Based on talking to the owner of the Stolen Porsche (the "Owner"), I learned that the Stolen Porsche was purchased at Manhattan Motorcars and that the Owner is a member of a country club called "Fenway."

27. Based on talking to law enforcement officers, I learned that TYREEK JAMES and OMARI WILLIAMS, the defendants, pled guilty in state court for their participation in robbing the Barbershop and the Cellphone Store.

WHEREFORE, deponent prays that warrants be issued for the arrests of TYREEK JAMES and OMARI WILLIAMS, the defendants, and that they be arrested and imprisoned, or bailed, as the case may be.

                                          /s/ sworn by telephonic means
                                          Detective Angelo Tessitore
                                          ATF/NYPD Joint Robbery Task Force

Sworn to before me this
11th day of May, 2020

*[signature: Gabriel W. Gorenstein]*

THE HONORABLE GABRIEL W. GORENSTEIN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

11